**NATIONAL LOCK WASHER CO. v. GEORGE K. GARRETT CO., Inc.**

No. 1100.

District Court, D. Delaware.

Nov. 26, 1937.

William G. Mahaffy and Herbert L. Cohen, both of Wilmington, Del., and George F. Scull (of Gifford, Scull & Burgess), all of New York City, for plaintiff.

Ayres J. Stockly (of Hastings, Stockly & Duffy), all of Wilmington, Del., and Henry N. Paul, Jr., and John H. Austin, (of Paul & Paul), all of Philadelphia, Pa., for defendant.

NIELDS, District Judge.

This is a suit for infringement of Loutrel patent No. 1,655,018, granted January 3, 1928, for a "Compression Spring Washer."

The defenses are:

(1) Invalidity (a) because the patent does not evidence the exercise of inventive faculty; (b) because the claims are anticipated by the prior art.

(2) Noninfringement.

Plaintiff, owner of the Loutrel patent, has a plant in Newark, N. J. Defendant, the manufacturer of the washers charged to infringe the patent in suit, has a plant in Philadelphia, Pa.

There are two claims in the patent, and both are in issue. Claim 1 is typical, and reads: "1. A compression spring washer of the split ring type formed of stock generally rectangular in cross section and comprising a helical segment more than 360° in circumference, the ends of the segment having opposed faces making angles with and intersecting the top and bottom of the washer stock throughout the width of the stock, said faces being spaced apart a substantial distance, said distance being less than the smallest dimension of the cross section of the stock and said faces being disposed relatively so that they will not contact materially as the washer is being flattened."

Upon analysis the claimed invention resolves itself into: (a) An angle cut split ring washer; (b) formed into a helical segment of over 360° measured from the top point to the bottom point; (c) having a gap between the ends which is small enough to prevent interlinking, but wide enough to provide a working clearance when the ends of the washer are compressed; and (d) having a substantial distance between the end faces, but less than the smallest dimension of the cross section of the stock.

## The Loutrel Patent.

The Loutrel patent relates to split ring washers. It is concerned only with the geometrical shape of such washers. It is not concerned with their method of manufacture. The split ring washer is the well-known lock washer used to prevent a screw, bolt, or nut from loosening under vibration. It operates as a spring under compression having sufficient elasticity to neutralize the play between the assembled parts. Some machines and devices are particularly subject to shaking or vibration. An automobile is a good example. So is the rail joint of a railroad track. These are held together by bolts and nuts. Each time a railroad car wheel passes over the joint, the bolts are shaken and possibly slightly elongated. To obviate the loosening of bolts and nuts, many different devices have been tried. The only one with which we are concerned is part of a helical spring in the form of a washer which is placed under the head of a bolt or under the nut and compressed when the bolt or nut is screwed up. To get the maximum compression of which such a washer is capable, the washer must be compressed until it is flattened out and affords a relatively complete circular support for the nut and the work surface.

The patent purports to cover washers which are "in the general form of a helical segment." It describes the geometrical considerations entering into the question of interlinking. It specifies four ways in which washers interlink. The patent teaches that the way to overcome interlinking is by means of a split ring in the general form of a helix with ends cut at an angle and separated by a slight clearance.

Loutrel's alleged invention is premised upon the misleading statement that split ring washers in the form of helical segments have always been made with square cut ends. In the specification he refers to the prior art washers as having end faces which "make right angles with the top and bottom of the washer." He states he has overcome interlinking by cutting the ends "so that the end faces made an angle with the top and bottom of the washer."

Moreover, the specification gives the impression that Loutrel was the first to suggest an angle cut washer. This may have influenced the Examiner in the Patent Office in granting his application. The Patent Office cited no prior art against the application which resulted in the patent in suit.

As set forth in a stipulation of record, there was an earlier application having different drawings and a different description which was reviewed by the Patent Office and against which certain prior patents were cited. This application was abandoned; a new and different one having been substituted which ultimately became the patent in suit. Against this new application, no prior art was cited by the Patent Office.

Loutrel made an analysis of the geometrical considerations entering into the question of the interlinking of washers. He was the first to make that sort of an analysis. He has set forth an interesting description of the reasons why certain washers will link with each other from a mathematical point of view. However, he has given a definite impression that angle cut washers were unknown in the prior art. He has obtained claims broad enough to comprehend such prior art.

### Prior Art.

Defendant has not offered in evidence any washers in use before the date of the patent. It found none. Even if found, it would be impossible to identify them as having been in public use at a particular date. Washers, screws, bolts, pins, and other common articles of manufacture are not preserved in stores or museums. They are not large or costly enough to bear the imprint of dates. Accordingly, defendant has been forced to rely upon publications. These publications include patents, catalogues, encyclopedias, and machinery text books.

Four catalogues were produced by defendant showing angle-cut washers offered for sale by different companies. One was published in 1921 by General Machinery & Supply Company and shows split ring washers with angle-cut ends and slight clearance. Another was published in 1925 by Positive Lock Washer Company. It shows split ring washers with angle cut ends and slight clearance. The catalogue states "Exhaustive tests covering a period of many years on railroad track, drop presses, automobiles and machinery subject to vibration, have proven its superiority over every other nut lock manufactured." Machinery Encyclopedia, published in 1917, states: "The double nut may work loose under constant vibration, but the split ring below the lower nut has a tendency to absorb the jar. This form has been extensively used in automobile frame construction." Timken Roller Bearings catalogues for 1919 and 1922 show split ring washers with angle ends.

Plaintiff objects to the showing in the catalogues because the side views in these catalogues do not correspond exactly with the plan view. The gap that appears in the plan view depends upon the line of vision between the washer and the draftsman. These drawings are only intended to show diagrammatically the characteristics of the washer offered for sale. The characteristics of the gap between the ends would be exhibited best to a customer in the side view where the angle cut and the overlapping clearly appear.

The British patent to Grover was granted in 1873. It discloses a number of different forms of split ring washers and two different ways to make them. The washer is formed into a helical segment of over 360° as measured by Loutrel's test. The gap between the ends is less than the smallest dimension of the washer stock but is sufficient to provide a working clearance when the washer is compressed.

Plaintiff argues that the washer of Grover is not a helical segment, because the pitch is less than the height of the washer stock. Grover's washer can be made, as explained in his specification, either by splitting a solid ring or by cutting segments from a continuous spiral coil. The word "helical" is applied generally to washers in which the top and bottom edges form spiral segments. A helix is a helix whether its pitch is great or small, and the term has nothing to do with the size of the stock given a helical shape. All of Grover's washers are helical segments. Certainly they are "in the general form of helical segments."

One form of Grover's washer is shown in Unwin's "Machine Design of 1882." This reference negatives plaintiff's contention that the British patent to Grover is a paper patent. It shows that Grover's washer by the year 1882 had come into such general use that it was referred to in mechanical text-books published in this country. It states that such washers have been "used as substitutes for lock nuts."

George K. Garrett, president of defendant company, died in the summer of 1937. In his patent No. 1,560,228 issued in November, 1925, Garrett describes a method and apparatus for making lock washers by cutting helical segments from a con-

tinuous coil. Garrett explained that the relationship between the ends of the washer may be varied by adjustment of the cutter and of the feed of the machine. Garrett also explained that the machine is desirably adjusted so "as to form each convolution of said coil slightly less than a full revolution," and further explains that the result of this is to cause the cutter "to sever a convolution of coil with the ends thereof spaced apart with a slight clearance, when the same are brought into alignment." In speaking of a convolution, Garrett is referring to the circumference as measured from the center of one end face to the center of the opposite face. Since the washers are cut on a slight angle each helical segment may be less than a full revolution and at the same time greater than 360° as measured by Loutrel's test.

These publications show that the angle-cut washer was well known in the art. It had been disclosed in patents ranging from the year 1873. It had been offered for sale in commercial catalogues of various companies throughout this country. The angle-cut washer had acquired such a standing in the art that it was referred to in encyclopedias as being "extensively used."

Angle-cut rather than square-cut ends and a slight clearance between the ends when compressed was characteristic of the prior art. That art for fifty years had been concerned only in obtaining efficient washers. A washer is more efficient when it provides a complete circular support for the nut and the work surface upon which it bears. It is undesirable to have a gap between the end faces into which foreign material, grit, and dirt may collect. The art advanced because it used angle-cut ends and provided a small gap between end faces.

▮ In this case the Loutrel claims, if construed as broadly as plaintiff suggests, would cover the prior art and make it impossible to produce the prior art washers. Yet a patent cannot monopolize the prior art which the public possessed before the patentee made his contribution. The public is free to use what it has always possessed and all obvious modifications thereof. A patentee cannot claim "obvious modifications" of this public domain such as variations in angle, pitch, and distance.

## Lack of Invention.

There is no doubt that part of the split rings in the prior art were noninterlinking. Loutrel's problem was to observe that part of the prior art. Such observation would demonstrate that noninterlinking depended upon one physical characteristic of the split ring. That characteristic was the angle of the angle cut of the ends of the ring or segment. The proper angle of cut at the ends will provide a circumference of over 360° from the tip of the top end to the tip of the bottom end. This angle of cut will afford the slight clearance between the faces of the ends. Finding the proper angle solves the problem of interlinking. This involves trial and error. It would not involve invention.

It is clear the Loutrel patent does not evidence the exercise of the inventive faculty. Obviously a complete or solid ring will not interlink. As interlinking occurs before compression in use, the problem is to give a split ring the characteristics of a solid ring, as near as may be. If the ends were square cut and the clearance slight you would have a soft spot between the ends when the washer was in use. To avoid square-cut ends the obvious expedient is to have ends that are angle cut. If the angle cut is obtained by winding the steel stock around a mandrel and slicing or breaking it diagonally across the axis of the mandrel the gap will have two dimensions; the distance between the faces and a pitch adequate for winding. When two angle-cut washers interlink through the pitch dimension you can readily observe that the points of contact are at the top points and bottom points of the cuts. To prevent linking it is only necessary to extend those points by reducing the angle of cut yet at the same time providing an angle affording a slight clearance only between the faces of the cuts. Finding the appropriate angle of cut is a practical problem for a good mechanic and does not involve invention.

The documentary evidence · makes it clear that no sooner did the customer complain about interlinking than the manufacturer gave assurance that it would be remedied. The problem of interlinking came with the high speed mass production methods in the automobile industry. The need for nonlinking washers was not expressed until about the time Loutrel made his invention. The evolution of the nonlinking washer shows the normal and natural development of the art. When the problem of interlinking came to the fore and required serious attention it was promptly

solved. Loutrel's original application was filed December 7, 1926, a little over a year after the time when customers began to complain to the washer manufacturers that the square-cut washers were interlinking.

■ Plaintiff has undoubtedly made and sold a large number of nonlinking washers. The record is silent as to whether it has sold any more washers or obtained any new customers since it acquired the Loutrel patent. Apparently the number of washers which plaintiff makes and sells bears a direct proportion to the number of automobiles manufactured. The great expansion of the automobile industry in this country accounts for the large volume of plaintiff's washer business. It is true that the patented washer is sold at a higher price than the square-cut washer, but a full explanation of this is to be found in a stipulation of record. This stipulation explains that there is a clause in the licenses granted under the patent in suit, fixing the prices at which the licensee may sell such washers. This commercial success does not weigh with the court because of the finding from other evidence in the case of the want of patentable invention in the Loutrel patent.

I find the Loutrel patent invalid.

This opinion contains a statement of the essential facts and of the law applicable thereto in conformity with Equity Rule 70½, 28 U.S.C.A. following section 723.